## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JAMAL SCOTT,

                       Plaintiff,

      v.

KEVIN KAUFFMAN, et al.,

                    Defendants.

CIVIL ACTION NO. 3:19-CV-00695

(MEHALCHICK, M.J.)

## MEMORANDUM

*Pro se* prisoner-Plaintiff Jamal Scott ("Scott"), a prisoner incarcerated at the State Correction Institution in Huntingdon, Pennsylvania ("SCI-Huntingdon"), initiated this 42 U.S.C. § 1983 civil rights action by filing a complaint on April 24, 2019. (Doc. 1). On January 14, 2022, Scott filed a second amended complaint asserting violations of his First, Fourth, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 and violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Religious Freedom Restoration Act of 1993 ("RFRA") for which he seeks declaratory, injunctive, and monetary relief. (Doc. 41). Before the Court is a motion for summary judgment filed by Defendants Department of Corrections ("DOC"), Bilgan Erdogan, C. Hawn, Kevin Kauffman, Ulrich H. Klemm, Justin Rainey, Mandy Sipple, Scott Walters, Jill Spyker, and Darrell Wireman. (collectively, "Remaining Defendants"). (Doc. 67). In addition, pending before the Court is Scott's motion to appoint counsel and motion to compel production of documents. (Doc. 52; Doc. 64). On November 13, 2019, the parties consented to proceed before the undersigned United States Magistrate Judge pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). (Doc. 16).

For the following reasons, Remaining Defendants' motion for summary judgment will be granted in part and denied in part. (Doc. 67). In addition, Scott's motion to appoint counsel and motion to compel will be denied. (Doc. 52; Doc. 64).

I.   **BACKGROUND AND PROCEDURAL HISTORY**

   A.   PROCEDURAL HISTORY

Scott filed his initial complaint on April 24, 2019, asserting violations of his federal civil rights under 42 U.S.C. § 1983 and violations of RLUIPA seeking injunctive and monetary relief. (Doc. 1). In his initial complaint, Scott asserted causes of action against ten defendants: the DOC; SCI-Huntingdon staff including Facility Manager Kevin Kauffman, Facility Chaplaincy Program Director Mr. Wireman, Corrections Classification Program Manager Ms. Sipple, Deputy Superintendent Scott Walters, Facility Chaplain Bilgan Erdogan, and Corrections Officers Hawn and Mills; John Wetzel, the Secretary of Corrections; and Ulrich H. Klem, DOC's Religion Volunteer and Recreational Services Program Administrator (collectively, "Original Defendants"). (Doc. 1, at 1-2). Original Defendants filed a second motion to dismiss on June 29, 2020. (Doc. 23). On February 8, 2021, the Court granted in part and denied in part Original Defendants' motion to dismiss and granted Scott leave to amend his complaint. (Doc. 26, at 27). Scott filed an amended complaint on March 19, 2021, adding additional Defendants: Jill Spyker, Sergeant Corley, W. House, Brousseam, Reverend Rainey, and J. Stanoasli (collectively "New Defendants"). (Doc. 29, at 2-3). New Defendants and Original Defendants filed a motion to dismiss the amended complaint on April 2, 2021. (Doc. 33). On December 21, 2021, the Court conducted its statutorily-mandated screening of the amended complaint in accordance with 28 U.S.C. § 1915A and 28 U.S.C. § 1915(e)(2) and found that Scott had failed to abide by the Court's

Order granting him leave to amend. (Doc. 39, at 1). The Court granted Scott leave to file a second amended complaint and struck New Defendants' motion to dismiss as moot. (Doc. 39, at 8-9). (Doc. 29).

Scott filed his second amended complaint (the "complaint") on January 14, 2022.[1] (Doc. 41). On January 28, 2022, Remaining Defendants filed a motion to dismiss Scott's complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure. (Doc. 42). On August 3, 2022, the Court granted in part and denied in part Remaining Defendants' motion to dismiss. (Doc. 48; Doc. 49). On August 24, 2022, Remaining Defendants filed an answer to Scott's complaint. (Doc. 50). On October 11, 2022, Scott filed a motion to appoint counsel, as well as a brief in support. (Doc. 52; Doc. 53). Scott filed three requests for production of documents, a set of interrogatories, and a request for admissions. (Doc. 54; Doc. 55; Doc. 60; Doc. 61; Doc. 62). On February 10, 2023, Scott filed a motion to compel production of documents, as well as a brief in support. (Doc. 64; Doc. 65). On March 8, 2023, Remaining Defendants filed a motion for summary judgment, as well as a statement of material facts, appendix of exhibits, and brief in support. (Doc. 67; Doc. 68; Doc. 69; Doc. 71). In addition, Remaining Defendants filed a brief in opposition to Scott's motion to compel. (Doc. 70). On May 10, 2023, Scott filed a brief in opposition to the motion for summary judgment and a response to Defendants' statement of facts. (Doc. 77; Doc. 78). In addition, Scott filed a reply brief to the motion to compel. (Doc. 79).

The motion to appoint counsel, motion to compel production of documents, and motion for summary judgment have been fully briefed and are now ripe for disposition. (Doc.

---

[1] Defendants John Wetzel, C.O. Mills, Sergeant Corley, W. House, Brousseam, and J. Stanoasli were not named in Scott's second amended complaint and were terminated from this action on January 14, 2022. (Doc. 41).

52; Doc. 53; Doc. 64; Doc. 65; Doc. 67; Doc. 68; Doc. 69; Doc. 70; Doc. 71; Doc. 77; Doc. 78; Doc. 79; Doc. 80; Doc. 81).

    B. STATEMENT OF FACTS

This factual background is taken from Remaining Defendants' statement of material facts and accompanying exhibits. (Doc. 71; Doc. 68). Scott has filed his response to Remaining Defendants' statement of facts and has provided accompanying exhibits. (Doc. 78; Doc. 80). Where Scott disputes facts and supports those disputes in the record, as required by Local Rule 56.1, those disputes are noted. As Scott is proceeding *pro se*, the Court will liberally construe his pleadings to accurately reflect what the record provides. Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. In addition, the facts have been taken in the light most favorable to Scott as the non-moving party, with all reasonable inferences drawn in his favor.

Scott is an incarcerated individual currently confined by the Pennsylvania DOC at SCI-Huntingdon. (Doc. 71, ¶ 1; Doc. 41, ¶ 3). The remaining claims in this case are:

(1) First Amendment and RLUIPA claims relating to a 2017 'Id feast (all Defendants)

(2) First Amendment, Fourteenth Amendment, and RLUIPA claims relating to Ramadan in 2018 and 2019 (all Defendants)

(3) First Amendment free exercise claim relating to access to religious materials in the Restricted Housing Unit ("RHU") (Defendants Spyker and Rainey only)

(4) First Amendment retaliation claim relating to 2018 Ramadan (Defendant Wireman only)

(5) Fourteenth Amendment claim relating to favoritism of other Muslim

group(s) over Scott's group ("ASMC").[2]

(Doc. 71, ¶ 2; Doc. 41).

The DOC has an Inmate Grievance System policy.  (Doc. 71, ¶ 3; Doc. 68-1, at 1-9). The DOC's Grievance Policy is set forth in DOC's Administrative Directive DC-ADM 804 ("DC-ADM 804"), entitled "Inmate Grievance System." (Doc. 71, ¶ 3; Doc. 68-1, at 1-9; Doc. 68-2, ¶ 2). Secretary's Office of Inmate Grievances & Appeals ("SOIGA") handles the Final Review of inmate grievances, the third and final step of DOC's Grievance Policy. (Doc. 71, ¶ 4; Doc. 68-2, ¶ 3). One of the responsibilities of SOIGA is to maintain a record in the Automated Inmate Grievance Tracking System of inmates' appeals to Final Review and SOIGA's responses to appeals to Final Review. (Doc. 71, ¶ 4; Doc. 68-2, ¶ 3). Assistant Chief Grievance Officer Keri Moore's duties include but are not limited to, reviewing appeals to Final Review at SOIGA to determine whether they comply with the requirements set forth in the DC-ADM 804 and reviewing all documentation to determine final disposition of the inmates' appeals.[3] (Doc. 71, ¶ 5; Doc. 68-2, ¶ 4). DC-ADM 804 provides a three-step administrative grievance appeal process that was established to ensure that inmates have an avenue through which to resolve issues relating to their incarceration.[4] (Doc. 71, ¶ 6; Doc. 68-1, at 1-9; Doc. 68-2, ¶ 5). Pursuant to DC-ADM 804, inmates first file grievances with the

---

[2] Scott denies this assertion in part, stating "Plaintiff asserted in an amended complaint that the Rmandam sign-up form was racist, a claim that has not been disputed or denie[d]." (Doc. 78, ¶ 2; Doc. 41).

[3] Scott denies this assertion, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 5).

[4] Scott denies this assertion in part, stating "This process does not exist. Denied. This process is available for an inmate in every instance except when housed in the Restricted Housing Unit on Di[s]ciplinary and Administrative Custody in accordance with DC-ADM 801-802." (Doc. 78, ¶ 6).

Facility Grievance Coordinator at the facility where the events upon which the complaint is based occurred. (Doc. 71, ¶ 7; Doc. 68-1, at 1-9; Doc. 68-2, ¶ 6). If the inmate is unsatisfied with the initial review of his or her grievance, he or she may file an appeal of the Initial Review Response with the Facility Manager (Superintendent). (Doc. 71, ¶ 7; Doc. 68-1, at 1-9; Doc. 68-2, ¶ 6). Upon receiving a decision from the Superintendent, the inmate may appeal that decision to Final Review by SOIGA. (Doc. 71, ¶ 7; Doc. 68-1, at 1-9; Doc. 68-2, ¶ 6). An appeal to Final Review must comply with the requirements set forth in DC-ADM 804 for the submission of appeals to SOIGA, or the appeal will be dismissed. (Doc. 71, ¶ 8; Doc. 68-1, at 1-9; Doc. 68-2, ¶ 7).

Through DOC's Inmate Handbook, inmates are provided with notice of the Grievance Policy and the requirements they must meet in grieving their issues through the Grievance Policy. (Doc. 71, ¶ 9; Doc. 68-2, ¶ 8). Keri Moore has access to the grievance tracking system which outlines all the grievances filed by Scott.[5] (Doc. 71, ¶ 10; Doc. 68-2, ¶ 10). Appendix at Exhibit A is a true and correct copy of the DC-ADM 804 that was in effect at the time that Scott filed the grievances addressed in this case.[6] (Doc. 71, ¶ 11; Doc. 68-2, ¶ 11). Keri Moore reviewed Scott's grievance appeal records from the time period of January 2017 to December 2019 to determine what grievances appealed to final review may be applicable to the issues in the above litigation.[7] (Doc. 71, ¶ 12; Doc. 68-2, ¶ 12).

---

[5] Scott denies this assertion, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 10).

[6] Scott denies this assertion, averring that the DC-ADM 804 policy was not submitted in its entirety. (Doc. 78, ¶ 11).

[7] Scott denies this assertion, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 12).

Scott filed three (3) grievances appealed to final review during that time frame on issues related to the practice of his religion, which are the three grievances he names in his lawsuit: Grievance No. 735904, Grievance No. 746178, and Grievance No. 802778.[8] (Doc. 71, ¶ 13; Doc. 68-2, ¶ 13). Exhibit "C" is a true and correct copy of the documentation for Grievance No. 735904. (Doc. 71, ¶ 14; Doc. 68-2, ¶ 14). Grievance No. 735904 is related to Scott's denial of Ramadan in 2018. (Doc. 71, ¶ 14; Doc. 68-2, ¶ 15; Doc. 68-3, at 1-12). Grievance No. 735904 named Defendant Wireman only, seeks $50,000 and was grieved to final review. (Doc. 71, ¶ 16; Doc. 68-2, ¶ 16; Doc. 68-3, at 1-12). Exhibit "D" is a true and correct copy of the documentation for Grievance No. 746178. (Doc. 71, ¶ 17; Doc. 68-2, ¶ 17; Doc. 68-4, at 1-7). Grievance No. 746178 related to Scott's claims that his religious group ("Ahlus-Sunnah Muslim community") was denied certain accommodations that other Muslims were granted. (Doc. 71, ¶ 18; Doc. 68-2, ¶ 18; Doc. 68-3, at 1-12). Grievance No. 746178 did not indicate what time frame Scott's alleged denials took place; as a result, his grievance was rejected and procedurally deficient according to prison grievance policy.[9] (Doc. 71, ¶ 19; Doc. 68-2, ¶ 19; Doc. 68-3, at 1-12). Exhibit "E" is a true and correct copy of the documentation for Grievance No. 802778. (Doc. 71, ¶ 20; Doc. 68-2, ¶ 20; Doc. 68-5, at 1-14). Grievance No. 802778 relates to Scott's denial of Ramadan in 2019. (Doc. 71, ¶ 21; Doc. 68-2, ¶ 21; Doc. 68-5, at 1-14). Grievance No. 802778 named Defendants Spyker and Erdogan only, seeks "injunctive relief,

---

[8] Scott denies this assertion in part, stating "Denied as to the three grievances filed being the only grievances relevant to the case." (Doc. 78, ¶ 13).

[9] Scott denies this assertion, stating "The [g]rievance was filed on July 11, 2018. The grievance was filed in relation to my list of actions taken dated July 5th and 6th." (Doc. 78, ¶ 19; Doc. 68-4, at 1).

monetary, and all else the court seems appropriate", and was grieved to final review.[10] (Doc. 71, ¶ 22; Doc. 68-2, ¶ 22; Doc. 68-5, at 1-14).

Reverend Uli Klem is currently employed by the DOC as the Religious Services Administrator in the Division of Treatment Services. (Doc. 71, ¶ 23; Doc. 68-6, at 1-6). Part of Reverend Klemm's responsibilities is to direct, plan and organize programs for various faith groups of inmates in the DOC's facilities and coordinate the provision of volunteer services at all State Correctional Institutions ("SCIs"). (Doc. 71, ¶ 24; Doc. 68-6, ¶¶ 2-6). Ramadan, a month-long fast with potentially differing dates every year, requires a lot of coordination of Department efforts, including:

a. Discerning the anticipated dates of the Ramadan Fast (as the dates follow the lunar calendar and are advanced approximately eleven days each year);

b. In conjunction with Central Office Food Services and the Division of Treatment Services, painstakingly review the content of the upcoming Ramadan Memo months ahead of the fast, to ensure that the fast is uniformly accommodated across the DOC;

c. Inviting each SCI to submit to the Division of Treatment Services the approximate number of Ramadan participants for the upcoming observance to enable Central Office Food Services/ARAMARK to order special foods provided by the DOC for fast bags and for the Eid al-Fitr Meal (marking the end of Ramadan);

d. Sending all SCIs the approved Ramadan Memo, a Ramadan sign-up form, and a list of Muslim Prayer Times during the month of Ramadan (which include when observant followers of Islam must begin their fast and when they can consume food after the sun has set);

e. All respective chaplaincy offices draft a Plan of Action based on the Ramadan Memo, Ramadan sign-up form, and Muslim Prayer Times during the month of Ramadan so that each prison administration understands how the accommodation will be made at its particular location;

---

[10] Scott denies this assertion in part, stating: "C/O Dixon was also mentioned." (Doc. 78, ¶ 22).

f.  When a Plan of Action is approved at each institution, the Chaplain's Office is tasked with announcing when Ramadan will take place and the need for each inmate to submit a Ramadan sign-up form by a particular deadline to the Chaplain's Office;

g.  When the Ramadan sign-up form is received by the Chaplain's Office, the Chaplaincy Program Director/Muslim Chaplain reviews each form to ensure that each inmate identifies with the Muslim faith and to determine which inmates may need to be counseled by the Medical staff (based on their self-disclosure of wishing to suspend life-threatening medications, a therapeutic diet, etc.);

h.  Chaplains forwarding lists of Ramadan participants to Medical;

i.  Chaplains finalizing the lists of Ramadan participants and ensuring that Security, Food Services, Unit Managers are all aware of proper line movements of Ramadan participants to break the daily fast with prayer and how participants will receive their meals before sunrise and after sunset; and

j.  Updating the list of participants throughout the month of fasting and informing the institutional staff of any changes.[11]

(Doc. 71, ¶ 25; Doc. 68-6, ¶ 6).

Inmates are eligible to fast during Ramadan if they are registered either as MUSLIM – ORTHODOX (SUNNI) or MUSLIM - OTHER in the DOC's Unit Management System.[12] (Doc. 71, ¶ 26; Doc. 68-6, ¶ 7). The Unit Management System is a computer database that shows, among other things, the religion that each inmate identifies with.[13] (Doc. 71, ¶ 27; Doc. 68-6, ¶ 8). This self-selection can be made by each inmate upon intake or anytime

---

[11] Scott denies this assertion in part, stating "Admitted, Ramadan is a month-long fast. Denied. After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 25).

[12] Scott denies this assertion, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 26).

[13] Scott denies this assertion, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 27).

thereafter by completing a Religious Preference Form. (Doc. 71, ¶ 27; Doc. 68-6, ¶ 8). In 2018, 459 inmates who identified as Muslim signed up for and participated in the Ramadan Fast at SCI Huntingdon.[14] (Doc. 71, ¶ 28; Doc. 68-6, ¶ 9). In 2018, a total of 7,780 inmates who identified as Muslim signed up for and participated in the Ramadan Fast Department-wide.[15] (Doc. 71, ¶ 29; Doc. 68-6, ¶ 10). In 2019, 412 inmates who identified as Muslim signed up for and participated in the Ramadan Fast at SCI Huntingdon.[16] (Doc. 71, ¶ 30; Doc. 68-6, ¶ 11). In 2019, a total of 7,968 inmates who identified as Muslim signed up for and participated in the Ramadan Fast Department-wide.[17] (Doc. 71, ¶ 31; Doc. 68-6, ¶ 12).

The DOC does not require an inmate to submit a religious accommodation request to participate in Ramadan. (Doc. 71, ¶ 32; Doc. 68-6, ¶ 13). In lieu of an accommodation request, and because Ramadan involves a month-long fasting and all of the DOC coordination above, the DOC requires inmates to complete a Ramadan sign-up form and submit the form by the deadline established at their SCI.[18] (Doc. 71, ¶ 33; Doc. 68-6, ¶ 14; Doc. 68-7, at 1-9; Doc. 68-10). The Ramadan sign-up form alerts each institution to which

---

[14] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 28).

[15] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 29).

[16] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 30).

[17] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 31).

[18] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 33).

inmates want to fast during Ramadan, which of those inmates receive medications and/or Therapeutic Diets/Snack Bags and wish to have them suspended during Ramadan, and which inmates wish to participate in evening prayers. (Doc. 71, ¶ 34; Doc. 68-6, ¶ 15; Doc. 68-7, at 1-9; Doc. 68-10). The DOC also requires inmates to sign their Ramadan form to acknowledge and adopt the assertions therein.[19] (Doc. 71, ¶ 35; Doc. 68-6, ¶ 16). If an inmate chooses not to complete the form, not to sign the form, or not to submit it timely and through the proper channels, that inmate will not be able to participate in Ramadan.[20] (Doc. 71, ¶ 36; Doc. 68-6, ¶ 17). These expectations are communicated to staff via a "Ramadan Memo" each year and communicated to inmates via an abbreviated Ramadan Fasting Procedures form and the Ramadan sign-up form.[21] (Doc. 71, ¶ 37; Doc. 68-6, ¶ 18; Doc. 68-7, at 1-9; Doc. 68-9, at 1-8).

Scott is an inmate currently being housed at SCI-Huntingdon. (Doc. 71, ¶ 38; Doc. 68-6, ¶ 19). The Ramadan memos, Ramadan sign-up form, and Ramadan Fasting Procedures were sent to all SCIs in 2018 and 2019, including SCI-Huntingdon.[22] (Doc. 71, ¶ 39; Doc. 68-6, ¶ 20; Doc. 68-7, at 1-9; Doc. 68-8; Doc. 68-9, at 1-8; Doc. 68-10, at 1). In 2018, Scott was provided a 2018 Ramadan sign-up form for completion, but Scott refused to sign the form.

---

[19] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 35).

[20] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 36).

[21] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 37).

[22] Scott denies this assertion in part, stating "After reasonable investigation the Plaintiff is without knowledge to form a belief as to the v[e]racity or accuracy of the averment." (Doc. 78, ¶ 39).

(Doc. 71, ¶ 40; Doc. 68-6, ¶ 21; Doc. 68-8, at 1). Scott was informed of the requirement to sign the 2018 Ramadan sign-up form to participate in Ramadan, but he still refused. (Doc. 71, ¶ 41; Doc. 68-6, ¶ 22). Scott was therefore not permitted to participate in 2018 Ramadan-related accommodations provided by the DOC, however, he could have chosen to engage in fasting on his own if he wished to do so.[23] (Doc. 71, ¶ 42; Doc. 68-6, ¶ 23). In 2019, Scott was provided a 2019 Ramadan sign-up form for completion; Scott refused to sign the 2019 Ramadan sign-up form. (Doc. 71, ¶ 43; Doc. 68-6, ¶ 24; Doc. 68-9, at 1-8). Scott knew of the requirement to sign the 2019 Ramadan sign-up form to participate in Ramadan, but he still refused.[24] (Doc. 71, ¶ 44; Doc. 68-6, ¶ 25). Scott was therefore not permitted to participate in 2019 Ramadan-related accommodations provided by the DOC, however, he could have chosen to engage in fasting on his own if he wished to do so.[25] (Doc. 71, ¶ 45; Doc. 68-6, ¶ 26).

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In deciding a summary

---

[23] Scott denies this assertion in part, averring that he was not permitted to fast on his own. (Doc. 78, ¶ 42).

[24] Scott denies this assertion. (Doc. 78, ¶ 44).

[25] Scott denies this assertion in part, averring that he was not capable of fasting on his own. (Doc. 78, ¶ 45).

judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore*, 24 F.3d at 512. "The party moving for summary judgment bears the initial burden of showing the basis for its motion . . . [and i]f the movant meets that burden, the onus then 'shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial.'" *Triad Controls, Inc.*, 593 F. Supp. 2d 741, 749 (E.D. Pa. 2009) (citing *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001)). "Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the

record that creates a genuine issue of material fact.'"[26] *Velentzas v. U.S.*, No. 4: CV-07-1255, 2010 WL 3896192, *7 (M.D. Pa. August 31, 2010) (quoting *Goode v. Nash,* 241 F. App'x 868, 869 (3d Cir. 2007) (citation omitted). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Goode*, 241 F. App'x at 869 (quoting *Berckeley Inv. Grp., Ltd. V. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir.2007). Further, "[t]he mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Turco v. City of Englewood, N.J.*, 935 F.3d 155, 161 (3d Cir. 2019) (citing *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)).

## III. DISCUSSION

### A. REMAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Moving for summary judgment, Remaining Defendants argue that summary judgment should be granted in their favor for the following reasons: (1) Scott failed to properly exhaust administrative remedies except for Defendant Wireman as to the 2018 Ramadan claim, and Defendants Spyker and Erdogan as to the 2019 Ramadan claims; (2) Scott's 2018 and 2019

---

[26] *See also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)).

Ramadan claims fail because the prison has a strong legitimate penological interest in maintaining safe and orderly Ramadan procedures for all inmates; (3) Scott's First Amendment claims for compensatory damages fail because he claimed no actual physical injuries; and (4) Defendants Wireman and Kauffman are entitled to summary judgment as to Scott's First Amendment retaliation claims because he was denied 2018 Ramadan due to his refusal to sign the DOC's form. (Doc. 69, at 14).

In opposition, Scott argues that the Court should deny Remaining Defendants' motion for summary judgment for the following reasons: (1) Remaining Defendants' affirmative defenses relating to exhaustion fall short; (2) Remaining Defendants cannot create and argue an issue different from the claims presented by Scott regarding the 2018 and 2019 Ramadan claims; (3) Physical injury is not a pre-requisite for compensatory damages as to First Amendment claims; and (4) Defendants Wireman and Kauffman denied Scott's 2018 Ramadan accommodations in retaliation for exercising his First Amendment rights. (Doc. 77, at 4-5).

### 1. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language is mandatory. *Ross v. Blake*, 578 U.S. 632 (2016). Moreover, the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Woodford*, 548 U.S. at 93 (quoting *Porter*, 534 U.S. at 525). Courts have concluded that inmates who fail to fully or timely complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See, e.g.*, *Booth v. Churner*, 206 F.3d 289 (3d Cir. 2000); *Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008); *Jetter v. Beard*, 183 F. App'x 178 (3d Cir. 2006).

While the PLRA itself, does not require a prisoner to have named each individual whom he sues in a prior grievance, *Jones v. Bock*, 549 U.S. 199, 218 (2007), "prisoners are required to complete the administrative review process in accordance with rules that are defined by the prison grievance process" — including the rules relating to whom must be identified in the grievance. *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones*, 549 U.S. at 218). If a prisoner fails to properly exhaust the available administrative remedies, he cannot bring suit on such claim(s) in federal court. *Goins v. Longstreet*, No. 12-CV-55, 2013 WL 869644, at *5 (W.D. Pa. Feb. 13, 2013) (citing *Oliver v. Beard*, No. 4:10-CV-1387, 2011 WL 4565787, at *7 (M.D. Pa. Sept. 29, 2011); *Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004)).

The DOC has implemented an official Inmate Grievance System, which is governed by DC-ADM 804. (Doc. 68-1, at 1-9). The relevant provision of the prison grievance process is DC-ADM 804 § 1.A.11, which, at the time Scott filed his grievances stated, in pertinent part: "The inmate shall identify individuals directly involved in the event(s)." (Doc. 68-1, at 2). The record reflects that Scott has filed three grievances in relation to the claims in this case: Grievance No. 735904, Grievance No. 746178, and Grievance No. 802778.[27] [28] (Doc. 68-3; Doc. 68-4; Doc. 68-5).

---

[27] Scott does not dispute Defendants' contention that he filed three (3) grievances appealed to final review during that relevant time frame on issues related to the practice of his religion, which are the three grievances he names in his lawsuit: Grievance No. 735904, Grievance No. 746178, and Grievance No. 802778. (Doc. 71, ¶ 13; Doc. 79, ¶ 13). Scott does dispute that these were the only grievances filed in relation to this lawsuit. (Doc. 78, ¶ 13). However, Scott does not support this assertion with evidence in the record. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (noting the "vastly different" standards applicable to motions to dismiss and motions for summary judgment); *Millhouse v. United States*, No. 1:19-CV-00665, 2021 WL 2412930, at *4 (M.D. Pa. June 14, 2021); *see* also M.D. Pa. L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statement."). To the extent that Scott attempts to incorporate evidence that he filed additional grievances (Doc. 77-2, at 21-26), Scott has failed to demonstrate that he appealed his grievances through "all three levels of review" and he also did not "comply with all procedural requirements of the grievance review process." *Stroman v. Wetzel*, No. 1:16-CV-2543, 2019 WL 931653, at *3 (M.D. Pa. Feb. 26, 2019); *see also Garcia v. Kimmell*, 381 F. App'x 211, 213 n.1 (3d Cir. 2010) ("Proper exhaustion in Pennsylvania requires completion of a three-part procedure; initial review, appeal, and final review.").

[28] Scott argues that he has "properly exhausted all RHU-related claims in accordance with DC-ADM 802." (Doc. 77, at 7). In support of his argument, Scott has provided an appeal to the Chief Hearing Examiner concerning his confinement to the RHU on Administrative Custody ("AC") pursuant to DC-ADM 802, the exclusive procedural vehicle an inmate in AC has to pursue any issues concerning placement, duration, conditions, or other circumstances related to AC-housing status. (Doc. 77-2); *see Lyons v. Beard*, No. 1:13-CV-2952, 2016 WL 3693747, at *5 (M.D. Pa. June 3, 2016), *report and recommendation adopted*, No. 1:13-CV-2952, 2016 WL 3683139 (M.D. Pa. July 12, 2016) ("an inmate in AC confinement may appeal issues related to his restricted confinement to the Program Review Committee (PRC), then to the Facility Manager, and then to the Chief Hearing Examiner"). However, the Court has previously dismissed Scott's Fifth Amendment claims concerning his placement in the

   i. Scott failed to identify certain Defendants in his grievances.

While Scott has attempted to satisfy the exhaustion requirements under DC-ADM 804 generally with regard to this lawsuit, he has failed to exhaust his claims against particular Defendants. (Doc. 68-3; Doc. 68-4; Doc. 68-5). As stated above:

> The failure to identify named defendants on the grievance form, . . . to the extent the identity of a defendant was "a fact relevant to the claim," . . . in the absence of any justifiable excuse, an [n] inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA.

> Williams v. Pa. Dep't of Corr., 146 F. App'x 554, 557 (3d Cir. 2005) (not precedential).

The exceptions to this rule are where identification is "not practicable," *Abney v. Younker*, No. 1:13-CV-01418, 2015 WL 10371482, at *7 (M.D. Pa. Feb. 24, 2015) (finding inmate's failure to identify officials in grievance not fatal because the inmate was unconscious and could not have identified participating actors), or where prison officials identify responsible parties as "fairly within the compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234.

On May 6, 2018, Scott filed Grievance No. 735904, relating to 2018 Ramadan. (Doc. 68-3, at 1-2). Grievance No. 735904 named one actor: Defendant Wireman. (Doc. 68-3, at 1-2). Similarly, on May 21, 2019, Scott filed Grievance No. 802778, relating to 2019 Ramadan. (Doc. 68-5, at 1-2). Scott's grievance only named two actors: Defendants Spyker and Erdogan. (Doc. 68-5, at 1-2). The participants in the alleged denials are certainly a relevant fact to these claims. *See Williams*, 146 F. App'x at 557. No subsequent grievance or appeal names the other officers who participated in the denial. Further, no evidence would indicate the prison

---

RHU without a misconduct charge and alleged seizure of property while he was placed in the RHU. (Doc. 48, at 16-18; Doc. 49).

identified the other officers in the course of the investigation as being fairly within the compass of the grievance or otherwise waived Scott's failure to identify them in his grievance.

Without cause to overcome his failure to identify certain Defendants in this action in any grievance related to his claims, Scott has failed to exhaust his claims against these Defendants. *Pressley v. Huber*, No. 3:08-CV-00449, 2018 WL 1079612, at *10 (M.D. Pa. Jan. 11, 2018), *report and recommendation adopted*, No. CV 3:08-0449, 2018 WL 1077300 (M.D. Pa. Feb. 27, 2018) (concluding plaintiff failed to exhaust his administrative remedies against defendants where he only named two actors in the grievance); *Gonzalez v. Kerestes*, No. CV 3:14-2104, 2016 WL 1103876, at *6 (M.D. Pa. Mar. 21, 2016), *aff'd sub nom. Gonzalez v. Mahanoy*, 668 F. App'x 408 (3d Cir. 2016) (granting summary judgment in favor of defendant where plaintiff failed to properly and fully exhaust his administrative remedies by not naming defendant in grievance). Under *Spruill,* it is the plaintiff's burden to explain why he did not name a defendant in the grievance. *See Spruill*, 372 F.3d at 234 ("Spruill did not[ ] [name Brown in his grievance] and has offered no explanation for his failure to do so.").

In his brief in opposition, Scott argues that at the time he filed Grievance No. 735904, it was impractical to name every Defendant because "many of the defendants' actions hadn't crystallized," and alleges that Defendants are engaging in a concerted effort to "dismantle" Scott's ASMC group. (Doc. 77, at 9-11). However, the record belies Scott's contention that he did not know the identities of Defendants Kauffman, Sipple, and Walters, as Scott received grievance appeal responses from these Defendants. (Doc. 68-3, at 3, 6; Doc. 68-5, at 6). Thus, the record demonstrates that Scott knew the identity of these Defendants. *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (explaining that "the onus" is on the prisoner to establish that the administrative remedies were unavailable to him); *Hardy v. Shaikh*, 959 F.3d

578, 587 (3d Cir. 2020) (reiterating that "the burden to plead and prove that he was thwarted rests on the inmate . . .").

Furthermore, the Court still finds that Scott has not presented any allegations in the complaint or submitted any evidence into the summary judgment record which would suggest that he could not file another grievance naming Defendants DOC, Kauffman, Sipple, Walter, Rainey, Hawn, and Klemm and allege facts relevant to them. *Brown v. Wetzel*, No. 1:21-CV-01436, 2022 WL 4647330, at *10 (M.D. Pa. Sept. 30, 2022) (concluding that prisoner-plaintiff had failed to present any facts or evidence that prison officials obstructed his attempt to exhaust administrative remedies, such that he would have been prevented from filing a new, separate grievance regarding any claims against defendants); *see Singleton v. Beadle*, No. 17-cv-220, 2018 WL 1129300, at *5 (M.D. Pa. Feb. 26, 2018) (concluding that prisoner-plaintiff had "failed to present any facts or evidence that prison officials obstructed his attempt to exhaust administrative remedies, such that he would have been prevented from filing a new, separate grievance regarding any claims against [d]efendants Bopp and Ferguson[,]" both of whom Plaintiff had failed to file a grievance against).

In sum, Scott has failed to exhaust his claims against Defendants except for Defendants Wireman, the only party identified in a grievance relating to 2018 Ramadan; and Defendants Spyker and Erdogan, the only parties identified in a grievance relating to 2019 Ramadan. Accordingly, Remaining Defendants' motion for summary judgment is **GRANTED** as to Defendants DOC, Kauffman, Sipple, Walter, Hawn, and Klemm for all claims.

### ii. Grievance No. 938672

In his brief in opposition, Scott argues that his DVD-related claims "remain a part of

this lawsuit over the dismiss attempt by Defendants" and have been properly grieved. (Doc. 77, at 7; Doc. 41, at 12). In support of his argument, Scott points to Exhibit H, a January 14, 2022, final appeal dismissal from SOIGA in which Chief Grievance Officer Kerri Moore denied his appeal of Grievance No. 938672 and requested relief. (Doc. 77-2, at 42).

The DOC's Inmate Grievance System Policy is set forth in DC-ADM 804. It contains the procedural rules that apply here to Scott's lawsuit, and it sets forth a multi-tiered grievance system, pursuant to which: (1) a prisoner is required to submit a written grievance within fifteen (15) working days of the alleged incident to the Facility Grievance Coordinator for initial review; (2) the prisoner is then required to submit a written appeal within fifteen (15) working days of an adverse decision to the Facility Manager; and (3) finally, the prisoner is required to submit an appeal of an adverse decision within fifteen (15) workings days to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). *See* DC-ADM 804, Inmate Grievance System Procedures Manual, §§ 1-2.

Here, Scott filed Grievance No. 938672 in connection to the underlying events in this action. (Doc. 77-2, at 21). In his grievance, Scott names Defendants Rainey and Spyker and alleges they refuse to air certain religious DVDs. (Doc. 77-2, at 21). On September 8, 2021, the Initial Review Response denied Grievance No. 938672, finding that the Islamic community was being accommodated by SCI-Huntingdon's Chaplaincy Department. (Doc. 77-2, at 40). Scott appealed his initial denial of Grievance No. 938672 to the Facility Manager and sought final review with the SOIGA. (Doc. 77-2, at 41-44). The grievance was denied at all levels of review. (Doc. 77-2, at 41-43).

As the record demonstrates that Scott pursued his grievance to final review and the grievance identifies individuals alleged in the incident, the Court will deny Defendants'

motion for summary judgment based on failure to exhaust claims against Defendants Rainey and Spyker. *Stroman v. Wetzel*, No. 1:16-CV-2543, 2019 WL 931653, at *4 (M.D. Pa. Feb. 26, 2019) (denying motion for summary judgment where plaintiff pursued his grievance to final review and his grievance comported with the reasoning that "the primary purpose of the grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued").

### iii.  Grievance No. 746178

Remaining Defendants argue Scott has failed to properly grieve Scott's Fourteenth Amendment Equal Protection claims concerning the ASMC community being treated in a discriminatory manner. (Doc. 69, at 17). Specifically, Correctional Defendants assert:

> Grievance No. 746178 concerning the ASMC issues was rejected because Scott did not indicate a time frame in his grievance and thus did not establish that the grievance was submitted within 15 working days of the events alleged therein as required by the prison grievance policy. Grievance is mandatory, and failure to properly exhaust pursuant to prison grievance policy is fatal to this claim in its entirety.

(Doc. 69, at 17-18).

This Court and courts in this Circuit have repeatedly held that "[a]n untimely administrative grievance does not satisfy the mandatory exhaustion requirements of the PLRA." *Payne v. Kabilko*, No. 3:17-CV-2063, 2018 WL 2771583, at *6 (M.D. Pa. Apr. 17, 2018), *report and recommendation adopted*, No. 3:17-CV-2063, 2018 WL 2771516 (M.D. Pa. June 8, 2018); *Riego v. Carroll*, 893 F. Supp. 2d 674, 679 (D. Del. 2012) (citing *Woodford*, 548 U.S. at 83–84); *see, e.g., Stewart v. Kelchner*, 358 F. App'x 291, 297 (3d Cir. 2009); *Barrick v. Prison Health Sys./Med.*, 335 F. App'x 153, 155 (3d Cir. 2009); *Williams*, 146 F. App'x at 558.

In opposition, Scott argues Grievance No. 746178 was rejected due to the religious issue, not the timing. (Doc. 77, at 6). Despite Scott's contention, the record demonstrates that

the grievance was denied as untimely at all levels of review. (Doc. 68-4, at 1-7). According to

the record, Scott initiated Grievance No. 746178, alleging a Fourteenth Amendment violation

relating to favoritism of other Muslim group(s) over his ASMC group on July 11, 2018. (Doc.

68-4, at 1). Grievance No. 746178 was initially rejected on July 12, 2018, for failing to comply

with the provisions of DC-ADM 804 in failing to provide any specific dates or information to

explain how the complaint is timely. (Doc. 68-4, at 2). Scott appealed this rejection, and the

rejection was confirmed on appeal on August 10, 2018. (Doc. 68-4, at 5). Scott appealed the

rejection of his grievance to SOIGA. (Doc. 68-4, at 6-7). On September 10, 2018, SOIGA

dismissed the appeal due to failure to comply with the provisions of DC-ADM 804 in failing

to submit within fifteen working days after the events upon which claims are based. (Doc. 68-

4, at 7). Thus, the Court finds that Scott failed to timely and properly exhaust his

administrative remedies as to Grievance No. 746178. *See Payne*, 2018 WL 2771583, at *4.

Accordingly, Remaining Defendants' motion for summary judgment is **GRANTED**

as to Scott's Fourteenth Amendment Equal Protection claims, and **DENIED** as to  Scott's

DVD-related claims against Defendants Rainey and Spyker. *See Wadlington v. Ferguson*, No.

1:18-CV-793, 2019 WL 4221086, at *5 (M.D. Pa. Sept. 5, 2019) (concluding defendants were

entitled to summary judgment where "it is undisputed that the grievance was untimely and

was rejected at all levels of review as "untimely"); *Payne*, 2018 WL 2771583, at *4. (granting

summary judgment to defendants and concluding prisoner-plaintiff failed to exhaust his

administrative remedies where prison officials reject grievance as untimely under DC-ADM

804).

### 2.  2018 and 2019 Ramadan Claims against Defendants Wireman, Spyker, and Erdogan

The First Amendment to the United States Constitution is made applicable to the states by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). It provides, *inter alia*, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const. amend. I. The protection for expressive activities offered by the First Amendment is lessened, but not extinguished, in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In the second amended complaint, Scott asserts that Remaining Defendants violated his First Amendment right to freedom of religion by requiring him to sign a form to participate in 2018 and 2019 Ramadan. (Doc. 41, ¶¶ 19-26). Remaining Defendants argue that Defendants Wireman, Spyker, and Erdogan are entitled to summary judgment as to Scott's First Amendment, Fourteenth Amendment, and RLUIPA claims regarding 2018 and 2019 Ramadan because the prison has a strong legitimate penological interest in maintaining safe and orderly Ramadan procedures for all inmates, that objective is rationally related to the requirement of the completion of the form, and no other ready alternatives exist that are less restrictive than simply completing a one-page form. (Doc. 69, at 20-22). Remaining Defendants do not dispute the sincerity of Scott's religious beliefs. Thus, the question before the Court is whether Remaining Defendants' practices violated Scott's right to freely exercise those beliefs when applying the Supreme Court's "reasonableness test." *See Turner*, 482 U.S. at 89; *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349, (1987).

> The test examines four factors: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forth to justify it; (2) whether there are alternative means of exercising First Amendment rights that remain open to the prisoner; (3) the impact that an accommodation of the asserted right will have on guards, other prisoners, and the allocation of prison resources generally; and (4) whether

there are alternatives that fully accommodate the prisoner's rights at a de minimis cost to valid penological interests.

*Scott v. Erdogan*, No. 3:12-CV-2041, 2015 WL 1405445, at *9 (M.D. Pa. Mar. 25, 2015) (quoting *Turner*, 482 U.S. at 89-91).

The Court must "determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity." *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000). Prison officials are not required to choose the least restrictive means possible in trying to further penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989). The burden is on the prisoner to disprove the validity of the regulation or practice. *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). However, it is the prison officials' burden to demonstrate a rational connection between the regulation or decision at issue and a valid penological interest. *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009). "Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement." *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002) (quoting *Waterman v. Farmer*, 183 F.3d 208, 217 (3d Cir. 1999)). If the government meets its burden, the court considers the other three *Turner* factors, and analysis of those factors is generally "fact-intensive." *Wolf*, 297 F.3d at 310.

Moving for summary judgment, Remaining Defendants aver that the prison has a strong legitimate penological interest in maintaining safe and orderly Ramadan procedures for all inmates, that objective is rationally related to the requirement of the completion and signature of the form, and no other ready alternatives exist that are less restrictive than simply completing a one-page form. (Doc. 69, at 20-22). Here, Remaining Defendants established that the policies and practices related to the requirement of a sign-up form were reasonably

related to the prison's legitimate interest in institutional security and maintaining order. (Doc. 71, ¶¶ 24-35); *see Dolan v. Lowe*, No. 3:14-CV-1436, 2016 WL 1128016, at \*8 (M.D. Pa. Mar. 18, 2016) (holding that prison's policy of inmates to establish a sincerely held religious belief in order to change a religious designation did violate the First Amendment because it advances the legitimate governmental interest of preserving prison resources and maintaining order); *see Ealy v. Keen*, No. 3:13-CV-2781, 2015 WL 1471577, at \*11 (M.D. Pa. Mar. 31, 2015) (holding that prison's policies and practices related to the employment of a full-time Iman, the religious services policy, restrictions on communal prayer, use of the chapel, supervision of religious services, use of prayer oils, meal preparation and distribution, and religious materials satisfies the "reasonableness test" articulated in *Turner* as the policies and practices further a legitimate governmental interest unrelated to suppression of expression); *see also Peele v. Klemm*, 663 F. App'x 127, 131 (3d Cir. 2016) (holding that prison restriction did not violate the First Amendment free exercise clause or establishment clause where "[prison] merely places restrictions on the two feasts: namely, that inmates must fast in order to feast, that they must pay for the feasts, and that inmates in disciplinary custody are not eligible for the feasts."). Further, there is nothing in the record to lead the Court to conclude that Scott's ability to practice his faith was restricted or that he was prohibited from practicing his religion in any manner, such as fasting on his own. Therefore, the Court concludes that Scott has not demonstrated that there exist genuine issues of material fact as to whether Remaining Defendants violated his First Amendment right to freedom of religion by denying Scott's participation in 2018 and 2019 Ramadan as the actions were reasonably related to a legitimate penological interest.

Accordingly, Remaining Defendants' motion for summary judgment is **GRANTED** in favor of Defendants Wireman, Spyker, and Erdogan with respect to Scott's 2018 and 2019 Ramadan First Amendment freedom of religion claim.

### 3. Claims for Compensatory Damages

Remaining Defendants argue that Scott should be precluded from pursuing compensatory damages on the ground that he has not alleged any physical injury, that would satisfy section 1997(e) of the PLRA. (Doc. 69, at 23-24). Section 1997(e) provides "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a proper showing of physical injury." 42 U.S.C. § 1997(e). The Third Circuit has interpreted this provision to preclude the recovery of compensatory damages for any claims that do not include physical harm. *Allah v. Al-Hafeez*, 226 F.3d 247, 250-51 (3d Cir. 2000). However, the Third Circuit has found that "certain absolute constitutional rights may be vindicated by an award of nominal damages in the absence of any showing of injury warranting compensatory damages." *Allah*, 226 F.3d at 250-51. Punitive damages may also be awarded based solely on a constitutional violation, and not based on any emotional or mental distress suffered, and those claims are likewise not barred by § 1997(e). *Allah*, 226 F.3d at 250-51.

Scott's second amended complaint seeks compensatory damages of an undisclosed amount. (Doc. 41, at 14). However, the allegations within Scott's second amended complaint fail to demonstrate a physical injury as a result of the alleged constitutional violation. Since Scott does not allege any physical injury, § 1997(e) bars any claim for compensatory damages. *Powell v. Pennsylvania Dep't of Corr.*, No. 1:12-CV-02455, 2019 WL 8510289, at *10 (M.D. Pa. July 15, 2019), *report and recommendation adopted,* No. 1:12-CV-02455, 2020 WL 1922639

(M.D. Pa. Apr. 21, 2020) (plaintiff's claim for compensatory damages was barred where he failed to allege any physical injury led to any mental or emotional harm); *Dillard v. Talamantes*, No. 1:15-CV-974, 2016 WL 7474803, at *9 (M.D. Pa. Dec. 29, 2016) ("Since [plaintiff] does not allege more than a *de minimis* physical injury, § 1997(e) bars any claim for compensatory damages). Importantly, both nominal and punitive damages are still available to Scott, assuming a jury finds that he had established all other elements of his claims. Thus, the Court will not dismiss his constitutional claims based solely on the physical harm requirement under the PLRA. *Gad v. Northampton Cty.*, No. 18-CV-3900, 2023 WL 2026630, at *6 (E.D. Pa. Feb. 15, 2023) (failure to establish the physical harm requirement under the PLRA is not a bar to relief with respect to nominal and punitive damages).

Accordingly, Remaining Defendants' motion for summary judgment is **GRANTED** as to Scott's compensatory damages claims.

### 4. First Amendment Retaliation Claim

In the second amended complaint, Scott alleges a First Amendment Retaliation Claim asserting:

> March 16, 2018 marks the first time Mr. Scott wrote Mr. Wireman quoting policy as it related to his job and responsibilities to Faith Groups as it relates to the ASMC. On the same day Mr. Scott wrote Superintendent Kauffman. The very next day, Mr. Wireman rejected my fasting accommodation, even though Mr. Scott was provided accommodations the previous year, and every year prior to that, without signing the accommodation forms.

(Doc. 41, § 37).

Defendants Wireman and Kauffman argue that they are entitled to summary judgment as to Scott's retaliation claim because Scott cannot prove that his protected activity was a substantial or motivating cause of Wireman's or Kauffman's actions. (Doc. 69, at 24). Moreover, Defendants Wireman and Kauffman aver that they would have taken the same

action in spite of his protected activity. (Doc. 69, at 24). In opposition, Scott argues that Wireman's and Kauffman's actions leading up to the denial of fasting and congregational prayer, and the denial itself, were based on Scott's "complaining and was a substantial or motivating factor in denying fast accommodations." (Doc. 77, at 18). Scott suggests that the Remaining Defendants do not have a legitimate penological interest or other alternative to denying Scott's Ramadan requests because the "Jewish, Jehovah's Witnesses, and Christian inmates have similar religious exercises that the prison accommodated without a sign-up form." (Doc. 77, at 15-16).

A prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove the following three elements: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002). While causation can be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence." *Carter*, 292 F.3d at 158. Motivation is thus typically shown by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Carter*, 292 F.3d at 158. Even where a plaintiff establishes a *prima facie* case of retaliation, "prison officials may still prevail if they establish that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *Carter*, 292 F.3d at 158. (quoting *Rauser*, 241 F.3d at 334).

Scott has set forth a prima facie retaliation claim. Requesting religious accommodations is a constitutionally protected activity. *Lindsay v. Chesney*, 179 F. App'x 867, 869 (3d Cir. 2006). Defendant Wireman's rejection of Scott's fasting accommodation could constitute an adverse action for purposes of a retaliation claim and the one day between his request for religious accommodation and rejection of Scott's fasting accommodation suggests retaliatory motive. *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (an "unusually suggestive temporal proximity" between the protected activity and purported retaliatory action can establish retaliatory motive).

However, the Court finds summary judgment is warranted because Defendants Wireman and Kauffman could avail themselves of the "same decision defense." *Real v. Grenevich*, No. 21-3132, 2023 WL 33338, at *2 n.3 (3d Cir. Jan. 4, 2023) ("When a prisoner establishes a prima facie retaliation claim, the burden shifts to the defendants to establish that they would have made the same decision, absent the protected conduct, for reasons reasonably related to a legitimate penological interest."); *see Watson*, 834 F.3d at 426 (explaining "same decision defense"). The record demonstrates that the requirement of a sign-up form to participate in Ramadan was reasonably related to the prison's legitimate interest in institutional security and maintaining order. (Doc. 71, ¶¶ 24-35). It is undisputed that Ramadan is a month-long fast that requires extensive coordination of the Departments involved. (Doc. 71, ¶ 25). The sign-up sheet requirement is reasonable in its scope in that it permits inmates to participate in the Ramadan Fast and advances the legitimate governmental interest of preserving prison resources and maintaining order. (Doc. 68-7, at 1-9; Doc. 68-8, at 1; Doc. 68-9, at 1-8; Doc. 68-10, at 1); *see Dolan*, 2016 WL 1128016, at *7. Scott, therefore, cannot maintain his retaliation claim regarding this action, for the relevant evidence of record

indicates that Defendants Wireman and Kauffman "would have made the same decision absent the protected conduct." *Rauser*, 241 F.3d at 334.

Accordingly, Remaining Defendants' motion for summary judgment is **GRANTED** and Defendants Wireman and Kauffman are entitled to summary judgment on the First Amendment retaliation claim.

B. SCOTT'S MOTION TO APPOINT COUNSEL

Although prisoners have no constitutional or statutory right to appointment of counsel in a civil case, the Court has the discretion to request "an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1); *see Parham v. Johnson*, 126 F.3d 454, 456-57 (3d Cir. 1997); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002); *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993). Under § 1915(e)(1), the "court may request an attorney to represent any person unable to employ counsel." The district court's appointment of counsel is discretionary and must be made on a case-by-case basis. *Tabron*, 6 F.3d at 157-58.

Appointment of counsel for an indigent litigant should be made when circumstances indicate "the likelihood of substantial prejudice to him resulting, for example, from his probable inability without such assistance to present the facts and legal issues to the court in a complex but arguably meritorious case." *Smith-Bey v. Petsock*, 741 F.2d 22, 26 (3d Cir. 1984). The initial determination to be made by the court in evaluating the expenditure of the "precious commodity" of volunteer counsel is whether the plaintiff's case has some arguable merit in fact and law. *Montgomery*, 294 F.3d at 499. If a plaintiff overcomes this threshold hurdle, other factors to be examined are:

> (1) the plaintiff's ability to present his or her own case; (2) the difficulty of the particular legal issues; (3) the degree to which factual investigation will be necessary and the ability of the claimant to pursue investigation; (4) the plaintiff's capacity to retain counsel on his or her own behalf; (5) the extent to

which the case is likely to turn on credibility determinations; and (6) whether the case will require testimony from expert witnesses.

*Montgomery*, 294 F.3d at 499 (citing *Tabron*, 6 F.3d at 155-57).

Additionally, another practical consideration must be taken into account when considering a motion for appointment of counsel. As the Third Circuit has observed:

> [W]e must take note of the significant practical restraints on the district courts' ability to appoint counsel: the ever-growing number of prisoner civil rights actions filed each year in the federal courts; the lack of funding to pay appointed counsel; and the limited supply of competent lawyers who are willing to undertake such representation without compensation. We have no doubt that there are many cases in which district courts seek to appoint counsel but there is simply none willing to accept appointment. It is difficult to fault a district court that denies a request for appointment under such circumstances.

*Tabron*, 6 F.3d at 157.

On the record presently before the Court, application of the *Tabron* factors weighs in favor of denying Scott's application for appointment of counsel at this time. In his present request, Scott discusses the applicability of the *Tabron* factors. First, Scott argues that his case will likely lose at the summary judgment stage because he lacks experience with gaining discovery evidence. (Doc. 53, at 4). Next, Scott contends that he lacks understanding in presenting his case in court, and does not comprehend the timing of objections, how to make objections, or how to argue against Remaining Defendants' objections. (Doc. 53, at 5). Scott also asserts that he cannot properly present the issues and lacks access to the law library. (Doc. 53, at 5). Scott notes that factual investigation is necessary to determine how Remaining Defendants have formed a consensus that Scott's Islam is invalid. (Doc. 53, at 6-7). Scott further avers that he lacks the capacity to retain counsel on his own behalf and that the case will turn on both credibility determinations and require expert testimony. (Doc. 53, at 6-7).

Here, the circumstances of this case implicate five of the six *Tabron* factors that weigh against of appointment of counsel. Regarding the first factor, Scott has thus far shown an adequate ability to litigate this case, demonstrated by the filing of his second amended complaint, motion to proceed *in forma pauperis*, and his various responses to all pending motions. (Doc. 1; Doc. 2; Doc. 7; Doc. 17; Doc. 18; Doc. 25; Doc. 29; Doc. 30; Doc. 35; Doc. 36; Doc. 37; Doc. 44; Doc. 45; Doc. 47; Doc. 52; Doc. 53); *see Montgomery,* 294 F.3d at 501. Furthermore, his brief in support of his motion to appoint counsel itself is well drafted, clear, concise, and cites to the relevant case law governing the issue. (Doc. 53). Through these filings, Scott "has shown he sufficiently understands court procedure" and has the apparent ability to comprehend the legal issues and litigate this action thus far. Thus, the Court finds, presently, the first factor weighs against the appointment of counsel. Although Scott has asserted multiple legal claims, none of those claims appear to involve complex legal issues. (Doc. 41). Furthermore, any factual investigation that Scott must do is minimal. The claims appear to involve a relatively discreet set of facts, many of which Scott presumably has personal knowledge of or is equipped to investigate. (Doc. 41). Additionally, it does not appear that this case will require testimony from expert witnesses as Scott's allegations of Remaining Defendants' violations of his constitutional rights would be understandable to a layperson without the need for expert assistance. *See, e.g., Montgomery*, 294 F.3d at 504 (holding "expert testimony is necessary when the seriousness of the injury or illness would not be apparent to a lay person."). However, the fourth *Tabron* factor, Scott's ability to retain counsel on his own, weighs in favor of granting the motion because Scott's *in forma pauperis* status demonstrates that he is unable to afford an attorney. (Doc. 7; Doc. 8); *see Tabron,* 6 F.3d at 156.

Nevertheless, the Court finds that Scott's apparent ability to litigate this action coupled with this Court's duty to construe *pro se* pleadings liberally weighs against the appointment of counsel. *See Shehadeh v. Wilkes-Barre City Police Dept.,* No. 3:21-CV-35, 2021 WL 2567020, at *2 (M.D. Pa. June 23, 2021). Accordingly, Scott's motion to appoint counsel (Doc. 52) is **DENIED**.

C.  SCOTT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

In his motion to compel discovery, Scott requests a Court Order directing Remaining Defendants to produce certain documents he requested on October 7, 2022, and on January 5, 2023. (Doc. 64; Doc. 65). Liberally construed, Scott also seeks responses to his requests for admission and interrogatories submitted to Remaining Defendants on January 5, 2023. (Doc. 64; Doc. 65).

Federal courts have broad discretion to determine the scope of discovery and to manage the discovery process. *See Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987) ("The conduct of discovery is a matter for the discretion of the district court and its decisions will be disturbed only upon a showing of an abuse of this discretion."). In the Third Circuit, "it is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's, 193 F.3d 766*, 777-78 (3d Cir. 1999). Federal Rule of Civil Procedure 37 governs motions to compel discovery, and "[t]he scope of what type of discovery may be compelled under Rule 37 is defined, in turn, by Rule 26(b)(1) of the Federal Rule of Civil Procedure." *Brewer v. Berks Cty. Sheriff*, No. 13-5763, 2015 WL 13620425, at *2 (E.D. Pa. Oct. 5, 2015) (quoting *Breslin v. Dickinson Twp.*, No. 09-1396, 2011 WL 1577840 (M.D. Pa. Apr. 26, 2011)). Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is

relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26(b)(2)(C) provides:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by **local** rule if it determines that:
>
> > (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> >
> > (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> >
> > (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.
>
> Fed. R. Civ. P. 26(b)(1)(C); *see Mayo v. City of Scranton*, No. 3:10-CV-935, At *3 (M.D. Pa. Feb. 21, 2012).

When deciding a motion to compel, "[t]he moving party bears the initial burden to prove that the requested discovery falls within the scope of discovery as defined by Rule 26(b)(1)." *Atkinson v. Luitpold Pharms.*, Inc., 414 F. Supp. 3d 742, 744 (E.D. Pa. 2019). "If the moving party meets this initial burden, the burden then shifts to the opposing party to demonstrate that the requested discovery (i) does not fall within the scope of discovery contemplated by Rule 26(b)(1), or (ii) is not sufficiently relevant to justify the burden of producing the information." *Atkinson*, 414 F. Supp. 3d at 744 (citation omitted). Discovery is governed by Rule 26, which provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

"Relevance in this context has been 'construed broadly to encompass any matter that could bear on, or that could reasonably lead to other matter that could bear on, any issue that is or may be in the case.'" *United States ex rel. Bergman v. Abbott Labs.*, No. 09-4264, 2016 WL 4247429, at *2 (E.D. Pa. Aug. 11, 2016) (quoting *Oppenheimer Funds v. Sanders*, 437 U.S. 340, 351 (1978)). The scope of discovery is broad, but it is not unlimited. *See Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999). Finally, discovery should not serve as a fishing expedition. *See Upshaw v. Janssen Research & Development, LLC*, No. 11-7574, 2014 WL 1244047, at * 3 (E.D. Pa. Mar. 26, 2014); Fed. R. Civ. P. 26(b)(1).

By way of procedural background, the discovery deadline was initially set for October 31, 2022. (Doc. 51). On December 14, 2022, the Court extended the discovery deadline to February 6, 2023. (Doc. 59). On February 10, 2023, Scott filed a motion to compel. (Doc. 64). In opposition to the motion to compel, Remaining Defendants argue that Scott's motion to compel is moot because Scott filed his motion before discovery responses were provided to him and discovery responses have now been provided. (Doc. 70, at 2-3). In response, Scott claims Remaining Defendants have not responded to his third request for production of documents. (Doc. 79, at 3). Furthermore, Scott contends Remaining Defendants' responses to interrogatories are "nothing more than pieces of paper, they have no legal standing, in that none of the interrogatories provided to Plaintiff were made under oath, nor were they signed by the person providing the answers or the attorney giving objections." (Doc. 79, at 3). On January 3, 2023, Scott sent a letter to Defendants' counsel attempting to clarify the October 7, 2022, request for production of documents. (Doc. 79-1, at 10). In response, Defendants' counsel sent Scott a letter on January 3, 2023, stating:

> In that letter, you reference a previous discovery request at averments 1-6. To date, I have received and responded to two Requests for Production of

Documents ("RPD"), and responses to a third RPD are forthcoming. None of the requests I've received match up to the averments you listed in this latest later. As such, I won't be providing any further response.

(Doc. 79-1, at 15).

As a threshold matter, Scott's motion fails because he does not proffer any explanation as to why the requested information is relevant to the claims remaining in this matter. Rather, Scott simply avers "Discovery in these documents are required in order to permit Plaintiff to properly prepare his case for trial in this matter." (Doc. 65, at 3). Scott also states "Discovery of the aforementioned Interrogatories, and Admissions are required in order to establish undisputed facts of this case." (Doc. 65, at 3). In both his brief in support and reply brief, Scott fails to identify specific portions of Remaining Defendants' responses he finds objectionable and offers no explanation as to why those responses are inadequate or why additional information sought would be relevant to his claims. *See Jones v. Sorbu*, No. CV 20-5270-KSM, 2022 WL 10493533, at *3 (E.D. Pa. Oct. 18, 2022) (concluding *pro se* plaintiff's motion fails because he does not proffer any explanation why any of the requested information is relevant to the claims remaining in this matter); *Rosenblit v. City of Philadelphia*, No. 20-3121-KSM, 2021 WL 288887, at *4 (E.D. Pa. Jan. 28, 2021) (denying the plaintiff's motion to compel where the plaintiff "failed to argue or discuss how the discovery he seeks is relevant to the claims or defenses in this case"); *Romero v. Allstate Ins. Co.*, No. 01-3894, 2012 WL 13234624, at *1 n.1 (E.D. Pa. Oct. 23, 2012) (finding movant failed to satisfy its burden where it offered only a "cursory argument regarding relevancy"). To the extent Scott is broadly arguing that he is entitled to additional responses from Remaining Defendants to his discovery requests, the Court cannot undertake a review of the adequacy of Remaining Defendants' discovery

responses that have not been provided to the Court and about which Scott has not provided specific articulation as to why the responses are inadequate.

Regarding Scott's contention that Remaining Defendants' interrogatory responses are invalid because only counsel signed the responses in violation of Fed. R. Civ. P. 33(b)(3), the Court will deny Scott's motion to compel. (Doc. 79, at 3). Federal Rule of Civil Procedure 33(b) provides, in part, that interrogatories must be answered "by the party to whom they are directed", "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath", and "[t]he person who makes the answers must sign them." Fed. R. Civ. P. 33(b)(1)(A), (b)(3), (b)(5). Rule 26(g)(2) of the Federal Rules of Civil Procedure also imposes a "signature requirement" on an attorney or party responding to discovery. Rule 26(g) provides in relevant part:

(1) Signature Required; Effect of Signature. Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name . . . . By signing, an attorney or [unrepresented] party certifies that to the best of the person's knowledge, information, and belief formed after reasonable inquiry:

(A) with respect to a disclosure, it is complete and correct as of the time it is made; and

(B) with respect to a discovery request, response, or objection, it is:

(i)  consistent with these rules and warranted by existing law . . .

(ii)  not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii)  neither unreasonable not unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Fed. R. Civ. P. 26(g).

- 38 -

"Pursuant to the Rule an attorney's signature certifies that any disclosures were complete and accurate at the time they were made and that a reasonable inquiry was made." *Younes v. 7-Eleven, Inc.*, 312 F.R.D. 692, 703 (D.N.J. 2015). (internal citations omitted). "Rule 26(g) does not require perfection and does not impose an unreasonably high burden on litigants. It simply requires that a reasonable inquiry be made into the factual basis of a discovery response and that responses to discovery be complete and correct when made." *Younes*, 312 F.R.D. at 706.

Upon consideration of the record, it is apparent that counsel for Remaining Defendants has satisfied the obligations set forth in Rule 26(g). (Doc. 79-1, at 25). Accordingly, Scott's motion to compel production of documents is **DENIED**. However, Remaining Defendants are directed to provide verification for their responses within the time set forth in the Order filed concurrently with this Memorandum. *See Metz Culinary Mgmt., Inc. v. OAS, LLC*, No. 3:21-CV-01023, 2022 WL 17978793, at *3 (M.D. Pa. Dec. 28, 2022).

Further, the Court is satisfied with Remaining Defendants' statement that the necessary disclosures have been provided to Scott in accordance with the Federal Rules of Civil Procedure. (Doc. 77); *see Molina v. Kauffman*, No. 4:21-CV-00038, 2023 WL 3077801, at *4 (M.D. Pa. Apr. 25, 2023) (denying prisoner-plaintiff's motion to compel where defendants aver necessary disclosure will be provided). Therefore, Scott's motion to compel will be **DENIED**. However, to ensure that Scott receives the responses to his discovery requests, the Court will direct Remaining Defendants to serve another copy of their responses within the time set forth in the Order filed concurrently with this Memorandum. Remaining Defendants are also reminded of their ongoing duty to supplement or correct any discovery responses if Remaining Defendants "learn[ ] that in some material respect, the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been

made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

IV.    CONCLUSION

For the reasons stated herein, the Remaining Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. (Doc. 67). In addition, Scott's motion to appoint counsel and motion to compel production of documents are **DENIED**. (Doc. 52; Doc. 64).

An appropriate Order follows.


                                                        BY THE COURT:


Dated: August 4, 2023                        *s/ Karoline Mehalchick*
                                                        **KAROLINE MEHALCHICK**
                                                        **Chief United States Magistrate Judge**